# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 0847 | **DATE** | February 8, 2002 |
| **CASE TITLE** | United States of America v. Earnest Wilson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, the Court DENIES Defendant Earnest Wilson's Motion to Quash Arrest and Suppress Physical Evidence [16-1]. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 11 2002 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
FEB 11 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Hon. Blanche M. Manning |
| v. | ) | |
| | ) | 01 CR 847 |
| EARNEST WILSON | ) | |
| | ) | |

## MEMORANDUM AND ORDER

The Government indicted Defendant Earnest Wilson on charges that he violated 18 U.S.C. § 922(g) and (k), alleging that he, as a convicted felon, knowingly possessed two handguns, one of which had the serial numbers removed and/or altered. The present matter comes before the court on Wilson's Motion to Quash Arrest and Suppress Physical Evidence. For the reasons that follow, including the court's assessment of the credibility of the witnesses, the motion is DENIED.

On June 18, 2001, at around 11:30 p.m., the Chicago Police Department ("CPD") arrested Wilson and charged him with unlawful possession of a handgun and defacing identifying marks on a firearm under Illinois law.[1] Exactly how this arrest came about is the subject of the present matter. The Court therefore held a hearing to assess the facts surrounding the seizure. The following discussion constitutes the Court's findings of fact and conclusions of law.

---

[1] The United States later indicted Wilson on federal gun charges in the present indictment.

# FACTS

As in most criminal cases, the defendant and the police each have different versions of how the arrest transpired.

## Defendant Wilson's Version of His Arrest

Wilson contends that he was driving north on Kingsbury on June 18, 2001 (a Monday) at 11:30 p.m., in a maroon Lincoln Navigator. He then turned east on Chicago from Kingsbury. As he did so, he noticed a marked CPD patrol car going west on Chicago. After turning east onto Chicago, Wilson contends that he saw the squad car execute a U-turn and proceed east on Chicago. Wilson then turned north on Hudson, which is approximately one block east of Kingsbury. While turning onto Hudson, Wilson saw the police turn on their emergency lights. He immediately pulled over at 825 North Hudson, approximately 25-30 feet north of Chicago.

According to Wilson, he got out of the car with his license and insurance card, which he was carrying in a pouch (a "fanny pack") around his waist. The two police officers then allegedly called him "Smokey" (his nickname) and told him to give them his license and proof of insurance. Wilson contends that these two officers had pulled him over on at least two or more prior occasions in the past month and searched his vehicle each time.

After receiving Wilson's license and insurance card, the officers asked Wilson to get back in his car. He was then asked to get out of his car and placed at the back end of his vehicle. According to Wilson, one of the officers then proceeded to search his vehicle and found a purple bag which contained a handgun. Wilson testified that the bag was in the back of the vehicle on the floor between the front passenger's seat and the back passenger's seat. Wilson stated that the bag was closed and tied together by two clasps.

According to Wilson, at no time did the officers ask for his consent to search his vehicle nor did he give them consent to search.

### CPD's Account of the Search of Wilson's Vehicle

CPD Officer Jesse Farmer testified that on June 18, 2001, at 11:30 p.m., he and his partner were driving east on Chicago when they observed Wilson's vehicle turn east on Chicago from Hudson. When Wilson turned onto Chicago, Farmer was approximately two car lengths behind Wilson. Farmer stated that he observed Wilson violate Illinois traffic law by turning left/north onto Hudson without signaling and failing to yield to oncoming traffic going west on Chicago. After observing this violation of Illinois traffic law, they pulled Wilson over at 825 North Hudson.

After pulling Wilson over, Farmer proceeded to the passenger's side of the vehicle, while his partner went to the driver's side. Farmer testified that Wilson appeared nervous and was sweating and that he fumbled a stack of cards, some of which he dropped and then picked up from the floor. Wilson also opened his glove compartment to look for proof of insurance. When Wilson opened his glove compartment, Farmer peered into the car, using his flashlight to see better, to make sure that Wilson was not going for a weapon. When he looked into the car, Farmer testified that he saw what appeared to be a "magazine" of a gun protruding 3-4 inches from under the front passenger's seat facing toward the front end of the car. At that point, Farmer signaled his partner to take Wilson out of the car. Farmer and his partner then conducted a pat down of Wilson and handcuffed him and placed him in the back of their squad car.

While he and his partner were taking Wilson out of the car and back to the patrol car, Officer Chmielik and his partner arrived at the scene. Farmer told Chmielik to "check

underneath the passenger's side seat." On direct examination, Chmielik testified that in response to Farmer's request, he opened the passenger's side door and "observed a weapon on the front floor of the vehicle with the barrel facing towards me." (Tr. at 94.) The AUSA then asked Chmielik whether the gun "you recovered [was] under the front passenger's seat?" Chmielik answered "correct."

## ANALYSIS

Wilson has moved to suppress the gun and all evidence relating to it on the grounds that: (1) the CPD stopped his car without probable cause; and (2) the search of his car and seizure of the gun was conducted without probable cause. The Government contends that the search and seizure were permissible: (1) under the plain view doctrine; and (2) as a search for weapons during a traffic stop under Michigan v. Long, 463 U.S. 1032 (1983).

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, and supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

As a general rule any search or seizure without a warrant is unreasonable. Katz v. United States, 389 U.S. 347, 357 (1967). A search or seizure in violation of the Fourth Amendment generally leads to the suppression of the unconstitutionally obtained evidence. United States v. Burns, 37 F.3d 276, 278-79 (7th Cir.1994). There are, however, exceptions to the warrant requirement.

One exception is the plain view doctrine. Horton v. California, 496 U.S. 128, 134-36 (1990); United States v. Wilson, 2 F.3d 226, 232 (7th Cir.1993). Under this exception, where a police officer sees an item from a lawful vantage point and with lawful access to the item, and it is immediately apparent to the officer that the item is contraband or incriminating, the search and

seizure of the item are permissible. Arizona v. Hicks, 480 U.S. 321, 326-27 (1987). Consequently, to meet the plain view exception, three elements must be met: (1) the viewing officer must be looking from a lawful vantage point; (2) it must be immediately apparent to the officer that the seized items are contraband or incriminating evidence; and (3) the officer must have lawful access to the seized object. Horton, 496 U.S. at 136-37; United States v. Willis, 37 F.3d 313, 316 (7th Cir.1994).

Applying the above standards to the present case, the seizure of the gun falls under the plain view exception if: (1) the police properly stopped Wilson's car for violating Illinois traffic law; and (2) it was immediately apparent to Officer Farmer that the dark object he observed sticking out from underneath the front passenger's seat of Wilson's vehicle was the magazine of a gun.

Because the analysis of these issues hinges on which version of events the Court finds most credible, the Court will review the credibility of the evidence presented at the hearing. Before discussing the credibility of the actual testimony, however, this Court will briefly review similar cases where courts were required to assess the credibility of the defendant and the police to determine whether a seizure of illegal contraband in an automobile fell under the plain view exception.

For example, in United States v. Thornton, 197 F.3d 241, 248-49 (7th Cir. 1999), the Seventh Circuit upheld the seizure of drugs from a vehicle under the plain view doctrine. At the suppression hearing, the police officer testified that as he approached an illegally parked vehicle in a "high crime area" he saw the defendant get out of the car with what appeared to be a police scanner. Id. at 246-47. While the officer patted down the defendant, he observed, on the rear

floor of the car, a package wrapped in tan tape which, in the officer's experience, appeared to be a kilogram of cocaine. Id. The defendant, on the other hand, testified that he was ordered to get out of his car and denied that there was a package on the rear floor of the car. Id. at 247. Even if the package had been in the car, the defendant contended that it would not have been possible for the officer to see the alleged package on the floor in the back of the car. Id. To support this contention, the defendant introduced a demonstrative videotape "purporting to show that the rear floorboard would not have been visible to the police officer." Id. The Government, however, introduced photographs "purporting to indicate that the rear floorboard would have been visible." Id.

Upholding the district court's denial of the motion to suppress, the Seventh Circuit noted that "we have a pure credibility clash, and although a police officer's badge is no absolute guarantee of honesty, an officer's testimony is never inherently less believable than the testimony of a defendant facing a long prison term." Id. The court thus held that the district court did not clearly err in finding the police officer's testimony more credible than the defendant's testimony. Id. at 247-48. Consequently, because the court found that the police officer lawfully approached the illegally parked vehicle and spotted the illegal contraband on the rear floor of the car, the seized evidence fell under the plain view exception. Id. at 248-49.

Similarly, in United States v. Dent, 984 F.2d 1453, 1459 (7th Cir. 1993), the police officer testified that he pulled the defendant's car over after he witnessed it run a stop sign. Id. at 1456. Because the car did not have license plates and the defendant failed to produce a driver's license, the police officer looked in the front and rear windows of the car to compare the car's VIN number with that on the "license-applied-for-sticker." Id. As he was comparing the VIN

numbers, the officer testified that he observed a "gun protruding from underneath the driver's seat." Id. The officer then placed the gun in his back pocket and asked the backup officer, who had just arrived at the scene, to watch the defendant. Id. at 1457. The officer, however, did not tell the backup officer that he found a gun or to handcuff the defendant. Id. Not until 5-10 minutes later, after the officer searched the car did he tell the backup officer that he found the gun. The backup officer testified that he did not see the gun in the officer's back pocket nor did he know that the gun had been found until after the search was completed. Id. at 1458.

The defendant contended that the officer did not see the gun through the window, but instead, took the keys from the defendant and did not find the gun until after an "extensive search of the car." Id. at 1457. In support of this contention, the defendant asserted that the testimony of the officer who found the gun was not credible because: (1) the backup officer did not see the gun in the other officer's back pocket when he arrived on the scene; and (2) the officer did not immediately tell the backup officer that he had found a gun or to place the defendant under arrest. Id. at 1458. Denying the defendant's motion to suppress, the district court held that while the testimony of the backup officer does not "exactly dovetail" with the testimony of the other officer, "the officers were both credible." Id. at 1459. Consequently, the Seventh Circuit upheld the district court's finding that a gun seen by the police underneath the driver's seat was in plain view. Id.

Here, Wilson contends that the Court should credit his version of the events – that the gun was in a closed bag on the floor in the back of the car and not in plain view – because the testimony of the police was not credible. In support of his assertion that the testimony of the

police is not credible, Wilson points to three inconsistencies in the testimony of the police. The Court will address each of these alleged inconsistencies in turn.

### How many times did Wilson drop the cards?

On direct examination, Farmer testified that Wilson was looking through a "three-and-one-half-inch stack of cards" for his license and that Wilson dropped some of the cards "one" time. (Tr. at 65-66.) In his affidavit, however, Farmer averred that Wilson dropped cards from the stack "several times." (Farmer Aff. at ¶6; Tr. at 69.) Farmer did not put anything in the arrest report or case report regarding the dropping of cards. (Tr. at 73-76.) On redirect, however, he testified that the purpose of the "arrest report narrative" is to "prove probable cause for arrest" and that the purpose of the narrative in the case report is to "provide a little more detail of the events that happened." (Tr. at 86.) Wilson denied ever looking through a stack of cards, let alone dropping any.

### Did Wilson rummage through his glove box before or after he gave the police his license?

On cross examination, Farmer testified that Wilson had given Farmer's partner his license before Wilson opened the glove compartment, and that Wilson looked in the glove compartment for proof of insurance. (Tr. at 71.) In his affidavit, however, Farmer stated that Wilson opened the glove box to look for both his license and insurance. (Aff. at ¶ 7; Tr. at 71-72.) Farmer did not put anything in the arrest report or case report regarding Wilson going through the glove compartment. (Tr. at 73-76.) Wilson denied ever looking in the glove box. He testified that he had his license and insurance card in a "fanny pack" which he gave to the police when he got out of his car.

-8-

### Was the gun under the front passenger's seat with the magazine sticking out or on the floor in front of the seat?

Farmer testified that when Wilson opened his glove compartment, he looked into the car and saw what appeared to be a "magazine" of a gun protruding 3-4 inches from under the front passenger's seat pointing to the front of the car. (Tr. at 78-79.) While he and his partner were taking Wilson out of the car and back to the patrol car, Farmer told Chmielik to "check underneath the passenger's side seat." (Tr. at 54.)

On direct examination, Chmielik testified that he recovered the gun under the front passenger's seat. (Tr. at 94.) On cross-examination, however, Wilson's counsel asked Chmielik the following: "[b]ut you told us when you went to the car that the gun was sitting basically on the floor in front of the passenger's seat, correct?" (Tr. at 98.) In response Chmielik answered "[i]t was lying on the floor." Wilson's counsel then asked him "[w]hen you opened the door of the car, you could see the whole gun. In fact it startled you because the barrel was pointed towards you, correct?" Chmielik replied that "[t]he weapon was pointing towards me, that is correct." Not satisfied with Chmielik's response, Wilson's counsel asked Chmielik "[b]ut the gun was clearly not under the seat. It was sitting on the floor in front of the seat, correct, when you saw it?" (Tr. at 99.) Chmielik answered "[w]hen I saw it [the gun], when I opened the vehicle and was physically in the vehicle, the weapon was facing me."

To determine whether the testimony of the officers regarding the location of the gun was credible, this Court ordered that Wilson's Lincoln Navigator and the gun in question be brought to the courthouse garage for the Court to view the actual position of the gun. The vehicle and the

gun were subsequently brought to the "sally port" of the courthouse.² With all parties present, the officers placed the gun in the position where it was discovered. The officers were able to demonstrate to this Court's satisfaction that it was possible for the gun to be placed underneath the front passenger's seat with the magazine protruding out 3-5 inches facing towards the front of the car and the barrel of the gun sticking out of the seat facing towards the front passenger's side door.

After carefully examining the testimony and evidence presented at the suppression hearing, the Court is faced with a very close call. The Court finds that the testimony of both the police officers and Wilson was facially credible. Although there were some slight inconsistencies in their testimony, the testimony of Officers Farmer and Chmielik regarding the placement of the gun is credible. See Dent, 984 F.2d at 1459 (slight inconsistencies in the testimony of the police does not make their testimony less credible than the testimony of the defendant).

Officer Farmer testified that he was only able to see the magazine from the vantage point where he was standing – parallel to the door handle of the Navigator on the front passenger's side, which was somewhat to the rear of where the weapon was located on the floor. At the hearing held in the sally port, Officer Farmer satisfactorily demonstrated to this Court that from this position he could only see the magazine portion of the gun because the rest of the gun was obscured by the front passenger's seat.

---

² A "sally port" is the secure area in the courthouse where the United States Marshals park when they bring in persons in custody. See United States v. Jamal, 87 F.3d 913, 915 (7th Cir. 1996).

-10-

Officer Chmielik, on the other hand, testified that when he opened the passenger's side door the barrel of the gun was facing him. Consequently, he viewed the entire gun, including the magazine. During the hearing at the sally port, Officer Chmielik satisfactorily demonstrated to this Court how he retrieved the gun and what he witnessed when he opened the front passenger's side door.

Moreover, while the Court finds that Wilson's testimony was certainly not incredible, the Court is troubled by Wilson's assertion that Officers Farmer and his partner had previously pulled him over twice or more before in the previous month and searched his car. During cross-examination, despite having admitted to being familiar with the complaint procedures of the CPD's Office of Professional Standards ("OPS") and filing prior complaints against other police officers with the OPS, Wilson could not name or specifically describe the officers – Officer Farmer and his partner – who arrested him on the night in question and who had allegedly stopped him on at least two prior occasions. The Court thus finds that this assertion by Wilson detracts from his credibility.

It is also incredible to believe Wilson's testimony that the officers would direct Wilson to get back into his vehicle, and immediately turn right around and order him out of the car. Wilson has failed to articulate any occurrence that would have prompted such a reversal of police procedure. It is more believable that Wilson was in the car from the inception of the stop, and was ordered out of the car once the officers had an opportunity to view the inside of the car for the officers' own protection. Wilson also testified that the officers knew him and he knew the officers. He testified that the officers knew him by "Smokey" (his nickname), which the Court infers was supposed to have some sinister meaning. Such an inference, in addition to Wilson's

-11-

assertion that the officers knew he was a high ranking gang member, would suggest to this Court that the officers would not instruct Wilson to get into his vehicle until they had checked his person for weapons and determined if he had any outstanding warrants.

Finally, while the time frame regarding precisely when Wilson gave his license to Officer Farmer's partner is conflicted by Officer Farmer's two slightly different versions of the incident, this Court finds that any slight inconsistencies do not detract from the fact that the police legally stopped Wilson's car for violating Illinois traffic law and that Officer Farmer observed what he believed to be the magazine of the gun from a vantage point where he had a right to be, i.e., standing outside the vehicle looking in.

Consequently, assessing the credibility of the witnesses and taking into account the plausibility of their testimony, demeanor, and motive to testify, this Court finds that: (1) the police properly stopped Wilson's car for violating Illinois traffic laws[3]; and (2) it was immediately apparent to Officer Farmer that the dark object he observed sticking out from underneath the front passenger's seat of Wilson's vehicle was the magazine of a gun.[4] Therefore,

---

[3] The decision to stop a vehicle is reasonable where the police have probable cause to believe a traffic violation has occurred. See, e.g., Whren v. United States, 517 U.S. 806, 809 (1996); United States v. Williams, 106 F.3d 1362, 1365 (7th Cir.1997). Upon witnessing Wilson commit the traffic violation of failing to signal, 625 ILCS 5/11-804, or yield to oncoming traffic, 625 ILCS 5/11-902, when he turned north onto Hudson from Chicago, the police clearly had probable cause to believe a traffic violation had occurred.

[4] The fact Officer Farmer used a flashlight when looking into the car is immaterial. Texas v. Brown, 460 U.S. 730, 740 (1983); United States v. Willis, 37 F.3d 313, 316 (7th Cir. 1994).

the Court concludes that the police officers' search and seizure of the gun was proper under the plain view doctrine.[5]

---

[5] Because the Court finds that the search was proper under the plain view exception, the Court need not discuss whether the gun was recovered as a search for weapons during a traffic stop under <u>Michigan v. Long</u>, 463 U.S. 1032 (1983).

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Earnest Wilson's Motion to Quash Arrest and Suppress Physical Evidence [16-1]. It is so ordered.

ENTER:  *Blanche M. Manning*
_____
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: 2-8-02